IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DUTCH O'NEAL, | ) Civ. No. 13-00058 ACK-RLP |
| Plaintiff, | ) |
| v. | ) |
| CENTURY INSURANCE COMPANY, | ) |
| Defendant. | ) |

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION TO STAY PROCEEDINGS

For the following reasons, the Court DENIES Century's Motion to Dismiss, or in the Alternative, Motion to Stay Proceedings.

### FACTUAL BACKGROUND[1/]

This case involves Plaintiff Dutch O'Neal's ongoing workers' compensation claim, which arises out of an accident that occurred on December 10, 2003, when he slipped and fell while working as an executive chef at the Dai-Ichi Resort in Saipan, Commonwealth of the Northern Mariana Islands ("CNMI"). Plaintiff alleges that Defendant Century Insurance Company denied or delayed workers' compensation benefits that he was owed.

### I. The Initial Injury and Subsequent Medical Treatment

---

[1/] The facts as recited in this order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings.

Plaintiff is a Hawaii resident. (Compl. ¶ 1.) At the time of his subject injury, he worked as an Executive Chef for the Dai-ichi Hotel in Saipan, CNMI.[2/] The Hotel had a workers' compensation insurance policy issued by Defendant Century Insurance Company ("Century"). (Id. ¶ 6.)

On December 10, 2003, Mr. O'Neal injured his lower back and one of his knees when he slipped and fell while working at the Hotel. (Id. ¶ 5.) He was diagnosed with a torn ligament in his knee and a lower back injury. (Id.) In early February of 2004, with his symptoms worsening, Plaintiff was transported "with the consent and assistance of Century" to Hawaii for diagnostic testing and treatment. (Id. ¶ 6.) Thereafter, all of Plaintiff's treatment occurred in Hawaii. After a lumbar spine MRI, Plaintiff was diagnosed with a herniated disk fragment requiring surgery. (Id. ¶ 7.) Plaintiff asserts in his Complaint that, due to delay in approval by Century, he did not actually undergo surgery for his spinal injury until November 10, 2004. (Id. ¶ 8.) He also had knee surgery in January of 2005. (Id.)

In August of 2006, Plaintiff's consulting neurologist, Dr. Leo Maher, recommended to Century a Treatment Plan (to be carried out on Oahu) headed by Dr Linda Rowan and Dr. Jeffrey Wang. (Id. ¶ 9.) In late 2006, Plaintiff's Century-assigned case

---

[2/] The Dai-ichi Hotel has since changed its name to Fiesta Resort and Spa. (Comp.¶ 5.)

manager discontinued her services; it was not until March 19, 2008 that Century assigned Plaintiff a new case manager (Deborah Smith). (Id. ¶¶ 10-11.) Plaintiff claims that this delay in assigning a new case manager resulted in delays in implementing his Treatment Plan, including a delay in approving a change of physician to Dr. Rowan. In April of 2008, Century approved the change of physician to Dr. Rowan, and agreed to provide Plaintiff with housing support so that he could undergo treatment on Oahu pursuant to the Treatment Plan. (Id. ¶ 12.)

On December 23, 2009, Dr. Rowan submitted to Century a proposal for the surgical implantation of a pain control device in Plaintiff's spinal column, a Spinal Cord Simulator ("SCS"). The treatment, involving a trial implant and, if successful, a permanent implant, was approved, and the trial implant surgical procedure was performed on January 6, 2010 by Dr. Wang. (Id. ¶¶ 13-14.) The trial implant reduced Plaintiff's pain symptoms and was deemed successful by Dr. Wang. (Id. ¶ 14.) Nevertheless, Century "verbally rescinded" approval of the permanent SCS procedure and "abruptly discontinued" the services of Deborah Smith, Plaintiff's case manager, on January 28, 2010. (Id. ¶ 15.)

A new case manager, who Plaintiff claims was less qualified than Deborah Smith, was assigned to Plaintiff two months later, on March 16, 2010. (Id. ¶ 16.) In the interim, Plaintiff's psychological and physical health continued to

deteriorate. (Id. ¶ 17.) Finally, after numerous requests for Century to reconsider approving the SCS procedure, Century re-approved the procedure on September 23, 2010. (Id. ¶ 18.) In light of Plaintiff's deteriorating condition, it was not until April 28, 2011, that he was cleared for the second trial SCS implantation procedure (a second trial was now required to ensure that the permanent implant would be successful). (Id. ¶ 20.)

On May 17, 2011, however, Century filed an administrative claim with the Workers' Compensation Commission of CNMI and suspended all payments for medical treatment or housing support. (Id. ¶ 21.) Despite Century's discontinuation of all payments and notice of suspension of benefits, on June 1, 2011, Dr. Wang proceeded with the second trial implant. (Id. ¶ 22.) Because of the delay in approval from the date of the first trial implant (in January of 2010) to the second trial implant (in June of 2011), however, scar tissue had accumulated in Plaintiff's spine, making a complete permanent SCS implant impossible. (Id. ¶ 23.) As a result, Plaintiff alleges that further surgical procedures will be necessary, and his physical and psychological condition continues to deteriorate. (Id. ¶ 23, 25.)

## II. The Workers' Compensation Commission Proceeding

Proceedings before the CNMI Workers' Compensation Commission ("the WCC") regarding Plaintiff's entitlement to workers' compensation benefits are ongoing. As discussed above,

on May 17, 2011, Century filed a "Notice of Suspension of (Workers') Compensation Benefits and Request for Hearing" before the WCC, and stopped paying Plaintiff's medical expenses and other related expenditures. (Id. ¶ 21.) In the administrative proceeding, Century seeks a ruling that Plaintiff has reached maximum medical improvement or, in the alternative, seeks to have the WCC Administrator take an active role in determining the course and nature of Plaintiff's treatment going forward. (Mot., Ex. A at 4.) Century also seeks an investigation into whether any medical malpractice or fraud may have occurred in connection with Plaintiff's treatment, and a determination that Plaintiff's disabilities that occurred after his initial injury are not a result of the original injury. (Id. at 4-5.)

  The WCC held a hearing on Century's administrative motion on August 25, 2011. (Compl. ¶ 24.) Medical considerations precluded Plaintiff from traveling to the CNMI for the hearing; however, he was able to attend the hearing by telephone. (Id. ¶ 24.) Plaintiff did obtain a "volunteer attorney" in the CNMI to represent him at the hearing. (See Mot., Ex. A at 3, 18 n.20.) At the time of the hearing, the hearing officer verbally ordered Century "to maintain medical treatments and housing subsidy." (Compl. ¶ 27.) Century notes that its total payments on Plaintiff's behalf exceed one million dollars. (Mot. at 2.)

  On December 30, 2013, the WCC issued an Administrative

5

Order concluding that an Independent Medical Examination is necessary for the WCC to adjudicate Plaintiff's case. (Mot., Ex. A at 11-12.) The WCC ordered Century to maintain Plaintiff's current level of compensation benefits and treatment until the administrative case is resolved. (Id. at 5, n.8.) The Independent Medical Examination was scheduled for June 25, 2014. (See Mot., Sia Decl. ¶ 5.) On July 11, 2014, Administrative Hearings Officer Bruce L. Mailman filed in the WCC his "Notice of Withdrawal of Administrative Hearings Officer." (Doc. No. 55.) Plaintiff's workers' compensation claim remains pending before the WCC.

## **PROCEDURAL BACKGROUND**

Plaintiff filed his Complaint in this district court on February 4, 2013. (Doc. No. 1.) In his Complaint, Plaintiff alleges the following claims against Century: (1) bad faith, (2) negligent and/or intentional infliction of emotional distress, (3) violation of Hawaii's Unfair Competition or Practices Act, and (4) defamation and slander. (Compl. at 2, 9-11.)

On August 14, 2013, the Court denied Century's Motion to Dismiss for Lack of Personal Jurisdiction or Improper Venue, or in the Alternative, to Transfer Venue, concluding that Plaintiff has demonstrated that this court has jurisdiction over the instant matter, and that venue is likewise proper. (Doc. No. 18.)

On May 20, 2014, Century filed the instant Motion to

Dismiss or in the Alternative Stay Proceedings. (Doc. No. 38 ("Motion").) Plaintiff filed his memorandum in opposition on June 20, 2014.[3/] (Doc. No. 46.) Century filed its reply on June 23, 2014. (Doc. No. 47.) A hearing on the motion was held on June 30, 2014. (Doc. No. 49.)

At Century's request (made during the hearing), the Court issued a minute order directing Century to file a petition with Administrative Hearing Officer Bruce L. Mailman seeking clarification regarding whether he intended to make further findings with respect to certain predicate facts before this Court, including with respect to the issues of reasonableness, bad faith, and failure to mitigate damages. (Doc. No. 50.) Shortly thereafter, Plaintiff's counsel informed the Court that Hearing Officer Mailman had withdrawn from the WCC case. (Doc. No. 55.) Century's counsel responded to this information via a letter to the Court stating that Century maintains that dismissal or a stay of the instant case is appropriate in light of the ongoing WCC action. (Doc. No. 56.)

## **DISCUSSION**

Relying on the primary jurisdiction doctrine, Century

---

[3/] On May 30, 2014, in response to Century's request, the Court advanced the hearing on the Motion to June 30, 2014. (Doc. No. 41.) On June 10, 2014, in response to correspondence from Plaintiff's counsel requesting that the hearing be set at a later date, the Court granted Plaintiff an additional ten days in which to file his memorandum in opposition to the Motion. (Doc. No. 43.)

7

moves for dismissal or a stay of all of Plaintiff's claims until there is a final adjudication by the WCC. Under the primary jurisdiction doctrine, courts may stay proceedings when issues involved in the proceedings are under consideration by an administrative agency with extensive regulatory powers over the matter and the parties involved. See Indus. Commc'n Sys. v. Pac. Tel. & Tel. Co., 505 F.2d 152, 156 (9th Cir. 1974). The doctrine applies to a claim that is originally cognizable in the courts but which requires the resolution of issues that are "within the special competence of an administrative agency." Reiter v. Cooper, 507 U.S. 258, 268 (1993); Aged Hawaiians v. Hawaiian Homes Comm'n, 891 P.2d 279, 289 (Haw. 1995). This doctrine allows the court to "refer" an issue to the administrative agency before proceeding with the suit. Syntek Semiconductor Co. v. Microchip Tech., Inc., 307 F.3d 775, 782 n.3 (9th Cir. 2002).

Thus, a court may "stay the proceedings while an administrative agency decides predicate issues necessary to adjudicate" the claims before the court. Jou v. Nat'l Interstate Ins. Co. of Haw., 157 P.3d 561, 567 (Haw. Ct. App. 2007) (citing Reiter, 507 U.S. at 268).[4] The Hawaii Supreme Court has recently

---

[4] The Court also has the power to stay proceedings under the Court's inherent power to control its own docket See Landis v. North Am. Co., 299 U.S. 248, 254–55 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.
(continued...)

stated that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." United Pub. Workers, AFSCME, Local 646, AFL-CIO v. Abercrombie, 325 P.3d 600, 610 (Haw. Feb. 28, 2014) (quoting United States v. Western Pac. R.R., 352 U.S. 59, 64 (1956) (alteration in original)).

Here, Plaintiff's claims are not brought under the CNMI Workers' Compensation Law. Rather, Plaintiff brings claims arising under Hawaii law for bad faith, negligent and/or intentional infliction of emotional distress, violation of Hawaii's Unfair Competition or Practices Act, and defamation and slander, all premised upon the allegations that Century has wrongfully delayed and denied Plaintiff's workers' compensation and thwarted his efforts to get effective treatment for his injuries. (See Compl. at 2, 9-11.) These causes of action are independent of the CNMI workers' compensation scheme. See Hough v. Pacific Ins. Co., Ltd., 927 P.2d 858, 869-70 (Haw. 1996) (acknowledging that bad faith is a tort cause of action

---

[4]/(...continued)
How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance"); Mediterranean Enter. v. Ssyangyong Corp., 708 F.2d 1458, 1465 (9th Cir. 1983) (the "trial court possesses the inherent power to control its own docket and calendar").

independent from Hawaii's worker's compensation scheme). Thus, while workers' compensation disputes in the CNMI generally appear to fall under the CNMI's comprehensive regulatory authority, see 1 N. Mar. I. Admin. Code §§ 20-100 *et seq.*, Plaintiff's claims in the instant suit arise independently under Hawaii law.

Importantly, however, the fact that Plaintiff's claims are not brought under the CNMI Workers' Compensation Act does not in and of itself foreclose the application of the primary jurisdiction doctrine. See United Pub. Workers, 325 P.3d at 613 ("The agency and the court need not have concurrent jurisdiction over the claims [for the primary jurisdiction doctrine to apply], as long as the agency and the court have concurrent jurisdiction over issues presented in the claims."). Thus, Century argues that the doctrine should apply because Plaintiff's Complaint raises predicate factual issues (for example, whether Century has unreasonably delayed Plaintiff's treatment, whether Plaintiff has been malingering, and whether the interventions Plaintiff seeks are necessary) that the WCC should be permitted to adjudicate in the first instance.

In his Complaint, Plaintiff alleges numerous bad-faith actions by Century, including the following: first, when Plaintiff's first nurse case manager resigned for personal reasons, Century did not replace her for more than a year. (Id. ¶ 10-11.) Century later fired Plaintiff's second case manager and

replaced her with an apparently uncertified case manager. (Id. ¶ 15-16.) Second, after Plaintiff had already received a successful trial SCS implant, Century rescinded its prior written approval for a permanent implant. (Id. ¶ 13- 15.) When Plaintiff appealed, Century did not reapprove the permanent implant until approximately nine months after it initially approved the SCS procedure. (Id. ¶ 18.) After Plaintiff received the second approval and underwent an evaluation process to ready him for a second SCS implant, Century filed its Notice of Suspension of (Workers') Compensation Benefits. (Id. ¶ 19-21.) When Plaintiff's doctor nevertheless proceeded with the SCS procedure, the permanent SCS implant was only partially successful because of "scar tissue [that] had accumulated in Plaintiff's spine during the period of [Century's] delay" in re-approving the procedure. (Id. ¶ 22-23.) Third, despite being ordered by a CNMI workers' compensation hearing officer to "maintain medical treatments and housing subsidy," Century has refused approval of certain treatments. (Id. ¶ 27-28.) Plaintiff also alleges that Century has defamed and slandered him by "accus[ing Plaintiff] of non-compliance with treatment recommendations [and] refusal to submit to medical procedures, propos[ing] an investigation for fraud, [and] hir[ing] an investigator to videotape and stalk [Plaintiff]." (Id. ¶ 38.)

In light of these allegations, Century is correct in

11

noting that adjudication of the instant case will involve an assessment of factual questions regarding the nature and extent of Plaintiff's injuries, whether he is entitled to the benefits he is requesting, and the reasonableness of Century's delays and denials of certain treatments. The WCC has, however, already made a number of findings in this case in its interim December 30, 2013 Order, and the Court cannot conclude at this time that any future order issued by the WCC will further address any or all of the predicate factual issues of the instant case.

In its December 30, 2013 Order, the WCC found that Plaintiff's injuries are compensable under the CNMI Worker's Compensation Act. (Mot., Ex. A ("12/30/13 Order") at 5-6.) Thus, it appears the WCC has already passed on one of the important issues in the case: Plaintiff's entitlement to workers' compensation benefits. The 12/30/13 Order also contains a lengthy "Findings of Fact" section, in which the WCC sets forth the factual background of the case, including the history and course of Plaintiff's treatments. (Id. at 6-11.) The WCC also states at one point in the order that Century has not acted in bad faith (noting that both parties contributed to the delays in Plaintiff's treatment). (Id. at 14.) Elsewhere in the order, however, the WCC states that it "decline[s] . . . at this point to make a determination of bad faith of either side for their respective parts in causing the delay," and that a dispute exists

as to "whether [Plaintiff] or Century is responsible for the long delay" in Plaintiff's spinal cord stimulator treatment. (Id. at 13 n.14.) The WCC makes these statements while also indicating elsewhere in the order that any future order will focus on the question of whether Plaintiff has reached maximum medical improvement or is malingering.[5/] (Id. at 14-15.) Thus, it is at best uncertain whether the WCC intends to revisit the issues of bad faith and the parties' respective responsibility for the delays in Plaintiff's treatment in a future, final order.

      The 12/30/13 Order also found that an independent medical examination ("IME") is necessary to determine whether Plaintiff has reached maximum medical improvement, and "to make a fresh determination of [Plaintiff's] status, his prospects, and his eligibility for continued compensation benefits." (Id. at 14-15.) Thus, the WCC plans to make such a "fresh determination" as to Plaintiff's case after reviewing the results of the IME. As discussed above, the Court acknowledges that there is some overlap between the predicate factual issues in the instant case and those underlying the WCC adjudication. It is unclear, however, whether the WCC's final, post-IME determination will involve only Plaintiff's current status and future prospects, or will delve into the factual disputes associated with his past

---

    [5/] The WCC also spends a considerable amount of the order discussing Plaintiff's credibility as a witness. (Id. at 15-22.)

course of treatment. The 12/30/13 Order is hardly a model of clarity as to the issues the WCC intends to address in a future, final order; however, based on what the Court has gleaned from a review of the 12/30/13 Order, the Court cannot conclude at this time that any future order issued by the WCC will address any of the predicate facts relevant to the instant case.

Further, it does not appear likely that the IME ordered by the WCC 12/30/13 Order will provide factual information relevant to Plaintiff's claims here. In its 12/30/13 Order, the WCC stated that the IME report must address the following issues: (1) whether Plaintiff has reached maximum medical improvement, (2) whether the prior spinal implants should be removed, (3) whether further surgical intervention is recommended, and (4) a revised treatment plan for Plaintiff, as well as "such additional matters as the examiner determines may be relevant to [Plaintiff's] ongoing treatment." (Id. at 15.) The IME itself will thus likely focus on Plaintiff's current status and prospects for future treatment. Plaintiff's claims in the instant case, however, focus on the past course of conduct between Plaintiff and Century. Further, in light of the fact that the hearings officer withdrew from the case in July of 2014, there will likely be a substantial delay in the adjudication of the WCC case, even after the IME report is completed. While any final order issued by the WCC could conceivably address issues beyond

14

those contained in the IME, based on the language of the 12/30/13 Order, the Court cannot conclude at this time that the WCC will address in the future any of the predicate factual issues relevant to the instant case.

The Ninth Circuit has emphasized that the doctrine of primary jurisdiction does not "require that all claims within an agency's purview . . . be decided by the agency." Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1172 (9th Cir. 2002). "Nor is it intended to 'secure expert advice' for the courts from regulatory agencies every time the court is presented with an issue conceivably within the agency's ambit." Id. (quoting United States v. General Dynamics Corp., 828 F.2d 1356, 1365 (9th Cir. 1987)). Indeed, when determining whether to apply the doctrine, "the court may take into consideration . . . the extent to which applying the doctrine could be prejudicial to either party." Pac. Lightnet, Inc. v. Time Warner Telecom, Inc., 318 P.3d 97, 118 (Haw. 2013) "A court should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate." Id. (quoting United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984)); see also Ricci v. Chicago Mercantile Exch., 409 U.S. 289, 321 (1973) (Marshall, J., dissenting) ("Wise use of the doctrine necessitates a careful

balance of the benefits to be derived from utilization of agency processes as against the costs in complication and delay.").

Here, the Court concludes that the potentially substantial delay associated with waiting for a final adjudication from the WCC more than outweighs any benefit that might be achieved by the mere possibility of having the WCC resolve some of the predicate factual issues in the instant suit. As discussed above, the Court has concluded that it is at best unclear whether a future WCC order will address any of the predicate facts in this case. Plaintiff's claims arise from an injury suffered in 2003, over ten years ago. (Mot., Ex. 1 at 1.) The WCC action was commenced in May of 2011, and over two years elapsed between the August 2011 WCC hearing and the issuance of the December 30, 2013 Order. (Id. at 3.) Moreover, on July 11, 2014, the hearing officer previously assigned to the WCC case withdrew, necessitating the appointment of a new hearing officer. (See Doc. No. 55.) This will undoubtedly cause further delays in the WCC adjudication. It is therefore conceivable that it may take several more years before the WCC issues a final order adjudicating the issues before it. In view of the glacial pace of the WCC action thus far, and in light of the fact that it is unclear whether a future WCC order will even address the predicate factual issues involved in the instant case, the Court believes that the interests of justice would not be served by

delaying the instant action, possibly for years, while waiting for a final WCC order.

The Court therefore declines to apply the primary jurisdiction doctrine at this time. The Court notes that on July 1, 2014 (before Hearings Officer Mailman withdrew from the WCC case), at Century's request, the Court directed Century to file a petition with the WCC seeking clarification as to the issues the hearings officer planned to address in a future order. (Doc. No. 50.) Century filed the petition with this Court for its review on July 10, 2014. (Doc. No. 51.) The Court has reviewed the proposed petition and has no objection to Century's filing it with the WCC, should Century so choose. Further, should Century receive a response from the WCC indicating definitively that it does intend to address forthwith factual issues predicate to this Court's determinations in the instant suit, Century may at that time file a motion with this Court reasserting its arguments as to the appropriateness of the application of the primary jurisdiction doctrine to the instant suit.

## **CONCLUSION**

For the foregoing reasons, the Court DENIES Century's Motion to Dismiss, or in the Alternative, Motion to Stay Proceedings.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 11, 2014.



_____
Alan C. Kay
Senior United States District Judge

O'Neal v. Century Ins. Co., Civ. No. 13-00058 ACK RLP, Order Denying Defendant's Motion to Dismiss, or in the Alternative, Motion to Stay Proceedings.